This morning is Pronschinske Trust against the Kaw Valley Companies. Mr. Arndt. Thank you, Your Honor. May it please the court, fellow counsel, this case is a basic interpretation of a private two-party contract. This is not to belittle the importance of the case. Private two-party contracts are the foundation of the great edifice which is American commerce. The canons of construction in construing contracts have been developed to ensure that we have consistent and, most importantly, predictable construction so that parties, while drafting contracts, may rely upon the clauses and words which are used in the contract. The overarching canon of construction which must be followed in this case and, indeed, takes precedence in all contract cases under Wisconsin laws articulated in the dispatch automation case. Common sense is as much a part of contract interpretation as is the dictionary or the canons of construction. But isn't the most natural reading of the notwithstanding sentence that the herein refers to Paragraph 6 rather than all provisions in the entire contract? I don't think that's the most natural reading. I think if they had intended to say notwithstanding the provisions contained in Paragraph 6, they could have said that. They said notwithstanding the provisions contained herein, which would mean the entire contract. I would note, Your Honor, that one of the things that was argued by the defense here is that if they had intended this to apply to the entire contract, they would have mentioned it elsewhere in the contract other than a single time. I guess the implication... Well, the notwithstanding line, which is located in the middle of Paragraph 6, which describes Paragraph 6 as such. It's a line that sets forth the calculation of the reduction royalties which are payable once sand, stone, and rock have been mined from the property. So in that context, the herein in the phrase, notwithstanding anything to the contrary, herein, seems to refer, you know, to Paragraph 6, such that notwithstanding the payments, calculations set forth in Paragraph 6, the lessee must pay production royalties of $75,000 if those payments, as calculated, are less than that amount. It sets the floor such that the lessor is guaranteed at least $75,000 annually in such payments once the products are being mined on his property, it seems to me. Well, I agree with you that it sets the floor, but your last phrase there, Your Honor, you said once the product begins being mined, and of course the clause doesn't say that. It sets the floor not conditioned, not triggered by once the products are being mined, but triggered upon the passage of the anniversary date of the effective date of the contract. I think it makes perfect sense that they put this clause into Paragraph 6 because it has to be coupled with the actual production because that's the credit that the mining company, that KC, gets if they have any actual production royalties paid. So it does have to be coupled into Paragraph 6, and it is, in fact, modifying the actual production royalty that is being paid. So it makes perfect sense that it would be in that specific paragraph. See, if the minimum production royalty was required to be paid from the outset of the lease, what would be the point of having an initial royalty credit and commencement credit, given that those credits would be immediately subsumed within the minimum production royalty for that year? Well, I understand your question, and it would not be immediately subsumed because they paid the $20,000 when they signed the contract, so the owner gets some payment when the contract is initially signed. Now, a year from now, a year from the signing, they get the $75,000. Now, at any point during the first year, the second year, the third year, when KC begins its mining operations, then they have to pay $45,000. Now, you are correct that they will get a credit for that royalty to be paid against the next royalty that's due. Now, the other question would be then, Your Honor, is if there is not a minimum, if it is not a floor of $75,000, why is there a termination clause? Because if there is a termination clause, it is there to stop the annual payment of $75,000. Otherwise, under KC's construction and the district court's construction, they would never have to terminate. They can just stay off the property. They have no obligation. They would never have to pay another dime. Now, that's where we get back to the common sense of interpretation of the contract because it is undisputed that one of the, well, the bundle of rights that the lessee obtained in this lease was to go into that property. There were buildings on that property. They could have tore those buildings down. They could have removed the topsoil, built berms around the property, completely altered that property. Now, under their position, the landowner gets paid nothing more, and then at the end, their position is that all of the payments stop. When they terminate, they could walk away. Well, that would make absolutely no sense that this entire bundle of rights was obtained for the grand payment of $20,000. Consider paragraph 2 of the contract. It is undisputed that one of the other bundles of rights, or bundle of the bundle of rights that the KC obtained, was to unilaterally extend the contract. And under paragraph 2, it's provided that after the initial five-year term, the lessee, as long as it fulfills one of four requirements, the lessee has the absolute right to unilaterally extend the contract. One of the four requirements is paragraph 2, Romanet 4. And under 2 Romanet 4, as long as the lessee is utilizing access roads to the property for ingress and egress to adjacent properties operated by the lessee, the contract can be extended indefinitely by the lessee without triggering any payment beyond the initial $20,000 initial royalty credit. The subject property does not have to be in production for them to travel across the subject property to service adjacent property, so no production royalties are paid. To be able to extend the contract indefinitely without any payment to the lessor is not a reasonable commercial interpretation of this contract. Now, the other two Romanets, well, one Romanet says as long as they're in production, so then the lessor would be being paid the production royalty. But the other two Romanets also do not require production. That's if the wash plant is operating or if they're basically keeping a scale there, which they could be doing to measure the transporting. That, again, would not be reasonable for the lessor not to be paid anything for the underlying property while the lease is extended indefinitely. It is important to note that the payments are not sequential. Both the district court and KC argue and then the district court found that these are one triggers the next, and that's absolutely not correct. The payments that are under the lease, there are actually five different types of payments. One is the initial royalty credit under Paragraph 3, and that is triggered by the execution of the lease. Another is the commencement royalty credit under Paragraph 5. That is triggered by the commencement of mine or quarry operations. Another payment is the production royalty under Paragraph 6, and that is triggered by the scaling of product as it is mined and leaves the property. The fourth is the annual minimum production royalty, and that is a floor of $75,000, and that is triggered by the anniversary date of the effective date. That's the only triggering device in that clause. The fifth payment is the $0.30 per ton transportation payment under Paragraph 7, when sandstone or rock is transported across the property from land situated off the property. That clause, just like the annual production royalty, has a triggering event that does not require the commencement of mining operation on the property or that production royalties be paid. These are not sequential payments. They are payments with specific triggering events. Casey cites- When did the plaintiff first request in writing the payment of the minimum production royalty? The plaintiff requested the minimum production royalty, I believe, after one year and subsequent to that. It was never requested in writing. Our comment to that is that's not required under the contract, but it clearly was requested. That's undisputed that they requested the payment. I will reserve the rest of my time for a rebuttal, please. Certainly, Counsel. Mr. Barnett. Thank you, Your Honors. May it please the Court. Appelese, Cavalli, and Casey Proponts asked the Court to affirm the summary judgment entered by Judge Crocker in the Western District of Wisconsin based on a few facts that are uncontested by the parties and the plain language that we've been talking about in Paragraph 6, as well as a broader reading of the entire contract that's at issue. Now, there's no dispute in the case that Appelese never mined any products. There's no dispute that they ever commenced minor quarry operations under Paragraph 3, and there's no dispute that any production royalties, as defined in Paragraph 6, ever became due in OE. As a result of those basic issues, and following the clear language of the contract, no minimum production royalty could have come due. The argument to the contrary at the lower court was called untenable by Judge Crocker because it doesn't flow from the plain reading of Paragraph 6, and it disregards other sections of the contract. Most notably, the payments that we contend, and the trial court certainly agreed, are sequence payments. The signing of a contract is going to logically become before the commencement of mining quarry operations, and you have to logically start mining quarry operations before you start getting items that are actually produced out of the mine and subject to the weight-based requirements. On the issue of the right to terminate, appellant's argument, as it's been presented at the district court and on appeal, is that they are entitled to a per-year payment for five years of $75,000 per year, regardless of the facts that develop on the mine or in the party's relationship. Now, if that's the case, and that is what's been argued, and what's been briefed to the court, that does overrule the right to terminate under Paragraph 2 that Lessee has, as well as the right to terminate under Paragraph 14, which covers a number of issues, including impracticability, zoning and licensing issues, including the CUP and that process that's been briefed to the court, as well as other issues, without saying anything about whether those royalties or whether the yearly payment could continue. Instead, in Paragraph 16, the contract simply says that at the time of termination, anything that's been accrued to that date must be paid. So the argument that we would go beyond that and make this a yearly guaranteed payment can't coexist with those provisions. Now, looking at Paragraph 6 itself, I would take issue with a couple of the rules of construction that we talked about. I think the Hummel case and To Fail, which are cited in the brief, both indicate that the plain and ordinary meeting is what to govern. In fact, To Fail, which is a Wisconsin Supreme Court case from 2013, says that it's the duty of the courts to apply the, quote, literal terms. So we have to look at and be guided by the language more so than the context. And here the language tells us exactly what to do. Now, it's critical in Paragraph 6 to note that the word mine is used four different times. Now, mine is defined in Paragraph 1 to include a number of operations, including querying, processing, crushing, manufacturing, washing, removing, and selling rock products. And so that sets out that the production royalties are tied to mining. You have to be taking rock product out of the ground, moving them, as set out in Paragraph 6, and again in Paragraph 9, and then apply the weight-based measurements. Now, when we get to, after we get past the timing requirement of weekly payments in the third sentence of Paragraph 4, we get to the fourth sentence, the notwithstanding provision. It's important to note that the first time the phrase minimum production royalty is used, the M on minimum isn't capitalized. Now, maybe it doesn't seem like a huge deal, but when it's not capitalized in that sense, minimum is used as an adjective. It is describing the amount of production royalties that would be paid and describing them as the minimum, the floor that would be paid after production royalties begin. And looking at the fifth and sixth sentence of Paragraph 6, they emphasize a process for calculating a minimum production royalty. An integral to that process is the actual accruance of production royalties, as those may be prorated versus the effective date, not set and established by the effective date of the contract. And they're referred to as a catch-up payment. All of the language in this whole apparatus doesn't make sense. It's not a logical reading of the contract if the party's intent was to create a guaranteed yearly payment, which, of course, it was not that intent. The intent was to have a phased contract and to have a minimum production to protect against slowdowns once operations have actually commenced. Is there anything in the record as to when plaintiff first notified the defendant that minimum production royalty payments were owed? I understand now that it was not requested in writing. Your Honor, there is some testimony cited in the party summary judgment briefing. Between the parties, the trustees do contend that they made oral requests for the minimum payment. I think that is actually controverted in that briefing. So I think that is a disputed issue. I don't think it's a disputed issue that matters because we are looking at an unambiguous contract and that we should be guided by the terms of that contract. And Judge Crocker, in looking at this argument, he called it untenable. And he walks through on page 10, and I believe 11, of the opinion why that's the case. One of the issues that he brought to bear was that it simply makes no sense to place this in the fourth sentence of the sixth paragraph. Now, what's left assumed by Judge Crocker's reasoning is that it would be illogical to put it here in a situation where the minimum production royalty could actually precede production royalties. It's not a logical placement for it. And under the argument that's been advanced by appellants, the minimum production royalty logically has to precede production royalties because it starts accruing on day one after June 28, 2012, when this contract is signed. And that doesn't square with the placement of the notwithstanding provision in the middle of a paragraph wholly dedicated to production royalties. Now, that reading of paragraph 6 is further validated by the other provisions in the contract, and I won't belabor those because counsel and I spoke about them. But the Temple List, Stanhope, and Tufale decisions all indicate that among the basic rules of construction, we also have to ensure that nothing is made meaningless or superfluous in a contract and that everything works together unless there's an express reason not to do so. Now, here we have the sequential payments, and simply as I read paragraphs 3, 5, and 6, I'm struck by how sequential they are, and I think that is the takeaway that Judge Crocker had as well. And that structure of the lease plays out and informs the party's intent as much as any specific word that's used. And the same thing is true with the right to cancel. And in fact, this contract was canceled in 2016 following a downturn in the market, which is one of the express bases for termination under paragraph 14, and there's been no suggestion that that termination was improper. One additional piece of the contract that also informs Apolli's reading of paragraph 6 is paragraph 9. It specifically refers to the royalties payable under paragraph 6 and 7, and again, that's validating that paragraph 6 is a paragraph about royalties, not about a yearly guaranteed lease payment. And with that, there was a reference to paragraph 7 in Mr. Arnn's discussion of his opening argument. Paragraph 7 hasn't been an issue in the case. I don't think any reference to it appears in any of the briefing. But paragraph 7 creates a possibility of if there is a scale or if there is any equipment on the property and sand or rock products from other property is transported across the Pronsinski Trust property, that there would be a payment condition on that. And so that makes that point about the ability to continue somewhat of a moot point, because the lessor also has the right to terminate the contract under paragraph 14 if the process is not advancing, and they did not do that. There's also significant argument in especially the reply brief by appellants that this is somehow an unfair contract. And the way that the contract played out, it didn't work out as a good deal for either party. Appellants and appellees agreed that there was going to be this process for payment. Appellees put in a significant amount of money that they lost because no rock products were ever mined, and appellants had their land under this contract, although not being actually used for any purposes during this time. But the issue is not the fairness of the contract. It's the clear language, and the context of a business agreement matters. But a number of the decisions cited, including the two-fail decision, look at the issue of whether it's a rational agreement for the parties to make. Now, under the facts, it may not have worked out the way that either party intended at the outset. However, it's a rational agreement to enter into to say, we will pay you as the project progresses, as we generate revenue, we'll pay you more. And I think we need to be mindful of the fact that there is no floor on the production, or sorry, there is a floor on the production royalties, but there is no maximum. No matter how much, how much, how many tons of rock products were mined, the Prochinsky Trust would continue to make more money equivalent as appellees as they move through the process. So based on both that plain language of the contract and the other terms, we would ask that the court affirm the summary judgment from Judge Crocker in the Western District. I thank you for your time. Thank you, Counsel. Anything further, Mr. Arndt? Yes, Your Honor, thank you. Answering Judge Rovner's question about the record, it's document number 39-1, the Cates deposition at page 56, line 14. Not only does Prochinsky say that he asked for the payment, Cates is the defendant representative. He admits that Prochinsky asked for the annual minimum production royalty payment. So the record does have that in there. Thank you. I'm sorry, Your Honor, did you have a question? No, I did. Thank you. Thank you. Okay. So circling back then to the argument made here that we should not construct a contract so that some of it is rendered as mere surplusage, that's exactly what's happened here to the very clause in question under the district court's decision and under the argument by Casey. The clause in question has to mean something. The parties would not have put it in there unless they wanted it to mean something. If it doesn't mean what Prochinsky says it means, it means nothing. Undisputed it is at the time of the signing that the anticipation was that if you ever went into production, there would never be less than 65,000 tons of rock or sand, I'm sorry, per year that was mined. So this would completely nullify the effect of the annual minimum production royalty. Casey's argument rests upon the premise that paragraph six defines production royalty, that production royalties are only paid once production is commenced, and production is only commenced when rock or products, in this case sand, is removed from the property and crosses the scale. Therefore, their argument goes the clause, because it's located in paragraph six, has to be triggered by production. There are two fatal flaws to that argument. The first is, as we've covered, the annual minimum production royalty is expressly, the plain words of the contract, triggered by the anniversary date of the effective date, which was June 28, 2012. But by definition, it is axiomatic to say that the annual minimum production royalty is not paid for product that has been scaled, removed, and from the property. In fact, it is the opposite. It is a payment that is due because sand has not been mined, scaled, or removed from the property. If there is enough sand mined, scaled, and removed from the property, the annual minimum production royalty would never be paid. The annual minimum production royalty is plainly not based on production. It is based on a floor, a minimum number of $75,000. KC cites paragraph nine as proof that the annual minimum production royalty is based on production. Paragraph nine clearly does modify both paragraph six and paragraph seven, making it clear that the production payment or the transportation payment occurs after the scaling occurs. Once again, paragraph nine obviously does not modify or have any effect on the annual minimum production royalty clause. Because again, it is axiomatic that the payment under the annual minimum production royalty clause is not being paid based on removal or scale. It's the opposite. Finally, KC had argued that the annual minimum production royalty clause is not mentioned anywhere else in the contract, and therefore it must show that it doesn't apply to the rest of the contract and it isn't that important. Well, it actually is mentioned in paragraph 13. Paragraph 13 is a typical commercial lease provision that says if there would be a mortgage payment that wasn't being paid or a tax payment or some other lien that isn't being paid, KC, to protect its interest, could step in and make that payment. And it specifically says, lessee shall be entitled to credit the amount of any such payment to reduce any regular or minimum royalty payments. Or minimum royalty payments. So it is mentioned elsewhere in the contract. The final question is, it's undisputed that they had the right to do all these things under the lease. If they had done the tearing down the buildings and tore up the land... Thank you, counsel. Thank you. The case will be taken under advisement.